UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------X
EFFENDI A. TORRES,

                    Plaintiff,              NOT FOR PUBLICATION

     -against-                  MEMORANDUM AND ORDER
                                           11-CV-05260 (KAM)

MICHAEL ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY

                    Defendant.
----------------------------X

**MATSUMOTO, United States District Judge:**

        Pursuant to 42 U.S.C. § 405(g), plaintiff Effendi A. Torres ("plaintiff"), appeals the final decision of defendant Michael Astrue, Commissioner of Social Security ("defendant"), which denied plaintiff's application for Social Security Disability ("SSD") under Title II of the Social Security Act ("the Act").  Plaintiff contends that he is disabled within the meaning of the Act and is thus entitled to receive the aforementioned benefits.  Presently before the court is defendant's motion for judgment on the pleadings as well as plaintiff's cross-motion for judgment on the pleadings.  For the reasons stated below, defendant's motion is granted and plaintiff's motion is denied.

**BACKGROUND**

## A.  Procedural History

Plaintiff filed applications for disability insurance benefits and Supplemental Security Income on October 30, 2007, contending that he had been disabled since July 31, 2003.  (ECF No. 15, Administrative Record filed 5/4/12 ("Tr."), at 122-24, 125-33.)  Plaintiff alleged that he was disabled due to complications resulting from lung surgery in 1998.  (*Id.* at 45, 49; *see also id.* at 144, 170.)  Plaintiff asserted that his discomfort and pain are symptoms of chronic obstructive pulmonary disease ("COPD").  (*Id.* at 22.)  The Social Security Administration ("SSA") denied his application on April 24, 2008. (*Id.* at 63.)

Plaintiff subsequently requested a hearing before an administrative law judge.  (*Id.* at 69.)  On July 29, 2009, plaintiff appeared with his attorney, Robert Purcigliotti, Esq., before Administrative Law Judge Manuel Cofresi ("the ALJ"). (*Id.* at 30.)  The ALJ adjourned plaintiff's July 29, 2009 hearing, however, after noting that there "[were] no treating source records" and that the record contained only "consultative examinations."  (*Id*. at 32.)  The ALJ thus offered to issue a subpoena to obtain any medical records if the plaintiff had any difficulties doing so on his own.  (*Id.*)

Plaintiff's continued hearing before the ALJ was held on November 17, 2009. (*Id.* at 18.) Plaintiff and Dr. Bernard Gussoff, M.D., the Administrator's medical expert, testified at the hearing. (*Id.* at 37-49, 50-58.) The ALJ asked Dr. Gussoff to describe the "limitations [that Dr. Gussoff was] able to take from the totality of [plaintiff's] medical record." (*Id.* at 54.) Dr. Gussoff found that plaintiff had "the capacity for sedentary activity." (*Id.*) Dr. Gussoff concluded that the symptoms described in the medical record did not limit plaintiff's ability to perform his past work. (*Id.*)

By a decision dated December 15, 2009, the ALJ found that plaintiff was not disabled. (*Id.* at 26.) The ALJ's decision became the final decision of the Commissioner on September 8, 2010 when the Appeals Council denied plaintiff's request for review. (*Id.* at 10-13.) Plaintiff then appealed the ALJ's decision, filing the complaint in the instant action on October 26, 2011. (ECF No. 1, Complaint, filed 10/26/11; *see also* ECF No. 13, Plaintiff's Memorandum of Law in Support of Cross-Motion for Judgment on the Pleadings filed 5/4/12 ("Pl. Mem."), at 10.)

## B. Non-Medical Facts

Effendi Torres ("plaintiff") was born on May 7, 1947 and is a citizen of the United States. (*See* Tr. at 37, 127.) Plaintiff has attended some college, lives alone and spends most

of his time at home, either reading or watching television.
(*Id.* at 39, 170.)  He does his own daily shopping (including
pushing and pulling a shopping cart), cleaning, laundry, cooking
and also tends to houseplants as a hobby.  (*Id.* at 39, 46, 171.)
Plaintiff is active in his church and participates in "a lot of
church functions," which constitute the bulk of his social life.
(*Id.* at 39, 47-48.)

Plaintiff has no problems using public transportation,
but has difficulty walking.  (*Id.* at 9, 42-43.)  He stated that
walking more than two and a half blocks can cause him to feel
dizzy and need to rest.  (*Id.* at 42.)  Nonetheless, plaintiff
testified that he regularly walks four blocks to and from his
chuch, albeit slowly, without assistance.  (*Id.* at 48.)
Plaintiff also avoids stairs and uses elevators whenever
available.  (*Id.* at 43.)  Plaintiff also stated that his feet
hurt after "a lot" of walking, and if he sits, he needs to stand
up and walk around, which makes him tired.  (*Id.* at 42.)
Plaintiff's medical records show that he is 5'3" and 208 pounds,
with slight weight fluctuations over the past ten years.  (*See
id.* at 44, 176, 171, 194, 206.)

From approximately July 1972 until July 2003,
plaintiff worked as an employment interviewer for the New York
Department of Labor.  (*Id.* at 37, 39.)  In this capacity,
plaintiff reviewed clients' work histories and attempted to

4

secure employment for them.  (*Id.* at 39.)  Plaintiff's duties as
an employment interviewer consisted of office work for seven and
half hours each day.  (*Id.* at 44, 142.)  Plaintiff interviewed
Spanish-speaking clients and interpreted when necessary.  (*Id.*
at 39.)  Plaintiff's position called for him to sit for five-
and-a-half to seven-and-a-half hours each day, for five days a
week.  (*Id.* at 44, 142.)  The position did not require plaintiff
to walk or stand for more than one hour each day.  (*Id.*)
Plaintiff rarely needed to lift objects while working, and never
lifted anything heavier than twenty pounds.  (*Id.*)
Plaintiff testified that he "loved working" and did not mention
any disputes with superiors or co-workers.  (*Id.* at 49.)
Plaintiff noted that he had hoped to work long enough to enhance
his pension before retirement.  (*Id.*)

Plaintiff has not worked since July 31, 2003.  (*Id.* at
45, 127.)  He testified that he stopped working because of
health problems that developed after his right lung was
partially surgically removed in 1998.  (*Id.* at 49-50.)
Plaintiff returned to work after the operation, but soon
complained of respiratory difficulties that interfered with his
work.  (*Id.* at 45.)  In particular, plaintiff reported that he
repeatedly "cough[ed] and would get dizzy" while working.  (*Id.*
at 45, 49.)  His cough has also made sleep difficult.  (*Id.* at

40.)  Plaintiff has been experiencing this cough for almost ten years, since the 1998 lung operation.  (*Id.* at 43.)

Plaintiff left his position in July 2003, after thirty years at the Department of Labor.  (*Id.* at 45.)  Plaintiff began collecting his retirement benefits soon afterwards.  (*Id.*)  Plaintiff has not worked since retiring in 2003.  (*See id.* at 45; *see also id.* at 136, 123.)

## C.  Medical Facts

### 1.  Hospitalizations

Plaintiff was voluntarily hospitalized at Mt. Sinai Medical Center in March 1998.  (*See id.* at 22, 148.)  This treatment began in response to respiratory discomfort, trouble breathing, and coughing blood.  (*Id.* at 144.)  Diagnostic tests indicated an infection in plaintiff's right lung, and plaintiff's right lung was partially removed.  (*Id.* at 144, 170.)  Since undergoing surgery to remove part of his right lung, plaintiff has complained that he coughs constantly every day and is often short of breath.  (*Id.* at 43, 170.)  Plaintiff contends that this is evidence of COPD.  (*Id.* at 22.)

### 2.  Physicians

#### a.  Dr. Sotorios Kassapidis, M.D. (Mar. 1998 – 2009)

Dr. Kassapidis, a board-certified internist and pulmonologist, has been plaintiff's primary treating physician since March 1998.  (Tr. at 22, 143.)  Dr Kassapidis works in the

Pulmonary and Critical Care Division of the Health Science Center in Brooklyn, where he is also an Assistant Clinical Professor of Medicine. (*See id.* at 264.)

In October 1999, Dr. Kassapidis administered a pulmonary function test to plaintiff prior to taking bronchodilators. (*Id.* at 22, 312.) The pulmonary function test indicated that plaintiff's forced vital capacity ("FVC") – the amount of air that plaintiff could expire after maximum inspiration – was 3.02 liters, which was 77% of the predicted value. (*Id.* at 22, 312.) After Dr. Kassapidis administered bronchodilators, plaintiff's FVC was 2.44 liters, which was 62% of the predicted value. This pulmonary function test also showed that plaintiff's forced expiratory volume in one second ("FEV1") – the volume of air that plaintiff could forcibly expire in one second after maximum inspiration – was 2.12 liters before Dr. Kassapidis administered bronchodilators, which was 72% of the predicted value. (*Id.* at 22-23, 312.) After Dr. Kassapidis administered bronchodilators, plaintiff's FEV1 was 1.80 liters, which was 61% of the predicted value. (*Id.*)

By 2001, Dr. Kassapidis had diagnosed plaintiff with diabetes mellitus. (*See id.* at 274 (progress note indicating that plaintiff showed symptoms of diabetes).) As of 2007, however, records reflect that plaintiff did not monitor his glucose levels and did not own a glucometer. (*Id.* at 277.) Dr.

Kassapidis has prescribed Metformin, Glucotrol, and Januvia throughout the past decade to control plaintiff's diabetes. (*Id.* at 23, 276-77.)

In 2007, Dr. Kassapidis referred plaintiff to Dr. Nicholas Kaloudis, an endocrinologist. (*See id.* at 222.) Dr. Kaloudis found that plaintiff showed signs of hyperglycemia, but that plaintiff had moderate glycemic control with no macrovascular contractions. (*Id.* at 276-277.) Dr. Kassapidis and Dr. Kaloudis both suggested that plaintiff lose weight, exercise frequently, and adopt a diabetic diet to help control the symptoms of diabetes. (*Id.* at 23, 277.)

As the ALJ observed in his decision, the medical records submitted do not contain treatment records of plaintiff by Dr. Kassapidis between March 2004 and June 2007 and between December 2007 and August 2009. (*Id.* at 23.)

Nonetheless, on August 14, 2009, Dr. Kassapidis confirmed plaintiff's earlier diagnosis of diabetes during plaintiff's last recorded visit with Dr. Kassapidis. (*Id.* at 189.) Dr. Kasspidis further diagnosed plaintiff with chronic cough, pulmonary tuberculosis, and COPD at that time. (*Id.*) Dr. Kassapidis also administered a pulmonary function test, which showed plaintiff's FVC was 2.16 liters before bronchodilators were administered, which was 61% of the predicted value. (*Id.* at 22, 314.) Plaintiff's FVC was 1.86

liters after bronchodilators were administered, which was 53% of the predicted value. (*Id.*) Plaintiff's FEV1 was 1.61 liters before bronchodilators were administered, which was 63% of the predicted value. (*Id.*) Plaintiff's FEV1 was 0.54 L after bronchodilators, which was 21% of the predicted value. Plaintiff's blood glucose level was 117 mg/dL, which was within the normal range. (*Id.*) Subsequently, on August 17, 2009, lab tests performed at Dr. Kassapidis's request confirmed that plaintiff did not have any active pulmonary disease. (*Id.* at 254.)

> **b.  Dr. Luke Han, M.D. (Mar. 2008) and Dr. Aurelio Salon, M.D. (Apr. 2008)**

On March 21, 2008, plaintiff saw Dr. Han, the Commissioner's internal consultative medical examiner, pursuant to a referral from the Division of Disability. (*Id.* at 23, 170.) Dr. Han found that plaintiff has normal gait and stance without assistance, could walk on his heels and toes, and could perform a full squat. (*Id.* at 171.) Dr. Han examined plaintiff's skin, lymph nodes, eyes, ears, nose, throat, and abdomen, and found all these areas normal. (*Id.*) Dr. Han also examined plaintiff's heart and found a regular rhythm, and noted that plaintiff had no audible murmur, gallop, or rub. (*Id.* at 172.) Dr. Han further found that plaintiff's abdomen was normal, plaintiff's fine motor activity was sound, and

plaintiff's musculoskeletal system showed no signs of injury or abnormality. (*Id.*) Dr. Han examined plaintiff's chest and lungs, finding no wheezing, rhonchi, or rales. (*Id.*) Dr. Han also found normal diaphragmatic motion and no scarring on plaintiff's chest wall. (*Id.*)

Consequently, Dr. Han diagnosed plaintiff with obesity, essential hypertension, and diabetes mellitus. (*Id.* at 173.) Dr. Han concluded that plaintiff was in "no acute distress" and gave plaintiff a prognosis of "fair." (*Id.* at 171, 173.) After diagnosing plaintiff, Dr. Han recommended that more information was needed regarding plaintiff's lung surgery. (*Id.* at 173.) At the time of the March 21, 2008 visit, Dr. Han concluded that plaintiff had "no physical restrictions for any regular daily activities." (*Id.* at 173.) Additionally, by virtue of the fact that records from plaintiff's treating physician were not obtained until 2009 (*see id.* at 36), it appears that Dr. Han did not have the benefit of plaintiff's full medical history when Dr. Han performed plaintiff's internal consultative medical examination in 2008.

Pursuant to Dr. Han's recommendation on March 21, 2008, plaintiff underwent a pulmonary function test administered by Dr. Aurelio Salon, M.D. on April 16, 2008. (*Id.* at 176.) This test showed that plaintiff's FVC was 2.88 liters, which was 90% of the predicted value. (*Id.* at 176.) The pulmonary

function test also indicated that plaintiff's FEV1 was 1.90 liters, which was 72% of the predicted value. (*Id.*) Based on the Pulmonary Function test, Dr. Salon concluded that plaintiff experienced "mild [respiratory] obstruction." (*Id.*)

### c. Dr. Bernard Gussoff, M.D. (Jul. 2009)

Dr. Bernard Gussoff, a non-examining physician, testified as a medical expert at plaintiff's November 19, 2009 hearing. (*Id.* at 24, 50-58.) Dr. Gussoff testified that plaintiff had non-insulin dependent diabetes, COPD, and obesity. (*Id.* at 24.) Dr. Gussoff found that none of plaintiff's medical conditions met or equaled the medical criteria of any listed impairment. (*Id.* at 24, 53.) Dr. Gussoff concluded that plaintiff was capable of performing "sedentary work" (*id.* at 54-55), which "requires sitting for prolonged periods totaling six hours over the course of an eight hour work day, standing and walking intermittently during the remaining time and lifting/carrying ten pounds occasionally," (*id.* at 24).

### D. The Parties' Motions

Defendant asserts in support of its motion that the ALJ correctly found that plaintiff's COPD, hypertension, diabetes, and obesity did not meet or medically equal the requirements of the Listing of Impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1, particularly sections 3.00 (respiratory system), 4.0 (cardiovascular system) and 9.0

11

(endocrine system). (ECF No. 11, Defendant's Memorandum of Law in Support of Motion for Judgment on the Pleadings filed 5/4/12 ("Def. Mem."), at 16.) Defendant also contends that the ALJ did not fail to develop the record, and that the ALJ was not required to obtain additional information from plaintiff's treating physician because the SSA must recontact the treating physician only if the medical evidence on record is "inadequate" to determine whether plaintiff is disabled. (ECF No. 14, Defendant's Reply in Support of Defendant's Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Cross-Motion for Judgment on the Pleadings filed 5/4/12 ("Def. Reply"), at 2 (citing 20 C.F.R. § 404.1519p(b)).) Defendant also argues that the ALJ gave the appropriate weight to the medical opinions in the record. (Def. Mem. at 18-19; Def. Reply at 3-4.)

With respect to the weight that the ALJ accorded the opinion of each physician, defendant argues that: (1) the ALJ properly considered the opinion of treating physician Dr. Kassapidis, who did not assert that plaintiff was disabled or that plaintiff could not perform sedentary work, and whose progress notes are consistent with the consulting examining physician's opinion, the medical expert's opinion, and the evidence in the case record (Def. Mem. at 17; Def. Reply at 3); (2) the ALJ properly gave great weight to the opinion of the SSA's medical expert, Dr. Bernard Gussoff, who found that

"plaintiff was capable of performing sedentary work" (Def. Mem. at 19; Def. Reply at 3-4); and (3) the ALJ properly gave significant weight to consultative examining physician Dr. Luke Han, who determined that plaintiff was not restricted from daily activities.  (Def. Mem. at 19; Def. Reply at 4.)

Defendant also argues that the ALJ properly evaluated plaintiff's credibility by considering plaintiff's reports of pain and physical discomfort.  (Def. Mem. at 20, Def. Reply at 5.)  Defendant asserts that the record does not support plaintiff's claim that constant coughing made working impossible after July 2003.  (*Id.*)  Specifically, defendant observes that plaintiff's ability to perform basic daily activities "belie[s] the plaintiff's allegations of an inability to work."  (Def. Reply at 7.)

Finally, defendant argues that the ALJ correctly determined that plaintiff was capable of performing his past work without the opinion of a vocational expert.  (Def. Mem. at 16; Def. Reply at 7.)  According to defendant, there is no evidence showing that plaintiff experienced a nonexertional impairment such as that resulting from exposure to dust and fumes.  (Def. Reply at 8.)  Defendant asserts that the ALJ was therefore not required to consult a vocational expert.  (*Id.*)

In support of his cross-motion for judgment on the pleadings, plaintiff argues that: (1) the ALJ failed to

adequately develop the record by declining to fill gaps in plaintiff's medical history and neglecting to recontact plaintiff's treating physician, Dr. Kassapidis, as required by 20 C.F.R. § 404.1520b(c)(1)-(2) (Pl. Mem. at 13-14); (2) the ALJ improperly weighed the opinion of Dr. Kassapidis by failing to consider the extent of plaintiff's relationship with Dr. Kassapidis (*id.* at 15); (3) the ALJ improperly evaluated plaintiff's credibility by failing to credit plaintiff's statements regarding subjective pain and discomfort (*id.* at 18-22); and (4) the ALJ erred in finding plaintiff capable of performing his past relevant work because the ALJ did not adequately develop the record of plaintiff's treating physician, which "perhaps" would have revealed if plaintiff suffered from "environmental restrictions, and, thus nonexertional impairments," "perhaps" necessitating the testimony of a vocational expert regarding plaintiff's ability to perform either his past work or work existing in the national economy (*id.* 22-25).

## DISCUSSION

### A. Standard of Review

"A district court may set aside the [ALJ's] determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537

F.3d 117, 127 (2d Cir. 2008) (internal quotation marks omitted).

"Substantial evidence" is "'more than a mere scintilla.  It

means such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.'"  *Halloran v. Barnhart*,

362 F.3d 28,31 (2d Cir. 2004) (quoting *Richardson v. Perales*,

402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d. 842 (1971)).  An

evaluation of the "substantiality of evidence must also include

that which detracts from its weight." *Williams ex rel. Williams*

*v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  If there is

substantial evidence in the record to support the Commissioner's

factual findings, those findings are conclusive and must be

upheld.  *See* 42 U.S.C. § 405(g) (providing that Commissioner's

factual findings are conclusive if supported by substantial

evidence).  Moreover, the reviewing court "may not substitute

its own judgment for that of the [ALJ], even if it might

justifiably have reached a different result upon a *de novo*

review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)

(internal quotation marks omitted).

## B.    Determining When a Claimant is Disabled

A claimant is disabled under the Social Security Act

when he or she is unable "to engage in any substantial gainful

activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous

period of not less the 12 months." 42 U.S.C. § 423(d)(1)(A).

The impairment must be of "such severity" that the claimant is "not only unable to do his [or her] previous work but cannot, considering his [or her] age, education and work experience, engage in any other kind of substantial gainful work [that] exists in the national economy." *Id.* § 423(d)(2)(A).

The SSA has promulgated a five-step sequential analysis requiring the ALJ to make a finding of disability if the ALJ determines:

> (1) that the claimant is not working, (2) that he [or she] has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his [or her] prior type of work, the Commissioner must find him [or her] disabled if (5) there is not another type of work [that] the claimant can do.

*Burgess*, 537 F.3d at 120 (internal quotation marks omitted); *see also* 20 C.F.R. § 404.1520(a)(4).

During this five-step process, the Commissioner must "'consider the combined effect of all [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity to establish eligibility for Social Security benefits.'" *Burgin v. Astrue*, 348 F. App'x 646, 647 (2d Cir. 2009) (quoting 20 C.F.R. § 404.1523). Further, if the Commissioner "'do[es] find a

medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.'" *Id.; see also* 20 C.F.R. § 416.945(a)(2).

In steps one through four, "of the sequential five-step framework," the claimant bears the "general burden of proving . . . disability." *Burgess*, 537 F.3d at 128 (internal quotation marks omitted). In step five, the burden shifts from the claimant to the Commissioner, requiring the Commissioner to show that in light of the claimant's residual functional capacity ("RFC"), age, education, and work experience, the claimant is "able to engage in gainful employment within the national economy." *Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997).

Additionally, in order to be eligible for disability insurance benefits, "an applicant must be 'insured for disability insurance benefits.'" *Armone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989) (citing 42 U.S.C. §§ 423(a)(1)(A), 423(c)(1), 20 C.F.R. §§ 404.130, 404.315(a)). In this case, therefore, plaintiff must demonstrate that he was disabled between his alleged onset date of July 31, 2003 and his date last insured, *i.e.*, December 31, 2008. *See, e.g., Perez v. Shalala*, 890 F. Supp. 218, 224 n.3 (S.D.N.Y. 1995).

## C.    The ALJ's Disability Determination

Using the five-step sequential process to determine disability mandated by 20 C.F.R. § 404.1520(a)(4), the ALJ determined at step one that plaintiff had "not engaged in substantial gainful activity" since July 31, 2003.  (Tr. at 20.) At step two, the ALJ found that the plaintiff had the severe impairments of COPD, "status post surgical removal of a part of the right lung," diabetes, hypertension, and obesity.  (*Id.*)  At step three, however, the ALJ found that through the date last insured, plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1520(d), 404.1525 and 404.1526).  (*Id.* at 21.) The ALJ determined that the criteria set forth in paragraph B of Medical Listing 12.03 were not satisfied because (1) plaintiff's COPD was not a marked restriction on his daily activities; (2) there was no evidence that plaintiff's diabetes caused significant and persistent disturbance of motor function in two extremities resulting in sustained disturbance of gross and dextrous movements or gait and station, acidosis, or retinitis proliferans; and (3) neither plaintiff's hypertension nor obesity increased the severity of other impairments.  (*Id.*)

At step four, the ALJ found that plaintiff "retained that residual functional capacity for at least sedentary work."

(*Id.* at 25.)  The ALJ based this conclusion on his findings that plaintiff could "sit without restriction, stand and walk intermittently for a total of two hours over the course of an eight hour work day and can lift/carry at least ten pounds on an occasional basis." (*Id.*)  The ALJ consequently found that plaintiff was capable of performing his duties as an employment counselor, which "did not require the performance of work-related activities precluded by the claimant's residual functional capacity." (*Id.* at 26.)

In deciding that plaintiff retained the RFC to perform the full range of sedentary work, the ALJ accorded Dr. Gussoff's opinion "great weight," accorded examining physician Dr. Han's opinion "significant weight," and accorded the opinions of treating physician Dr. Kassapidis "controlling weight in so far as they [support] a finding that the claimant's conditions do not meet or equal a listing." (*Id.* at 25-26.)

D.  **Analysis**

1.  **The ALJ's Affirmative Duty to Develop the Record**

   a. **Legal Standard**

Generally, an ALJ has an "'affirmative duty to develop the administrative record.'" *Anderson v. Astrue*, 07-CV-4969, 2009 WL 2824584, at *12 (E.D.N.Y. Aug. 28, 2009) (quoting *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999)).  Pursuant to 20 C.F.R. §§ 404.1512(e) and 416.912(e), when the evidence received

from a claimant's treating physician, psychologist, or other medical source is inadequate to determine whether the claimant is disabled, the ALJ has an obligation to seek additional information to supplement the record. *Mantovani v. Astrue*, No. 09-CV-3957, 2011 WL 1304148, at \*3 (E.D.N.Y. Mar. 31, 2011) (collecting cases). The ALJ bears this duty whether or not a claimant appears with representation. *Batista v. Banhart*, 326 F. Supp. 2d 345, 353 (E.D.N.Y. 2004). The duty does not arise, however, where there are no obvious gaps in the administrative record, *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999), or where the medical record is simply inconsistent with a treating physician's opinion, *Rebull v. Massanari*, 240 F. Supp. 2d 265, 273 (S.D.N.Y. 2002).

Nevertheless, the ALJ must seek additional evidence or clarification when a report from a medical source contains a conflict or ambiguity, lacks necessary information, or is not based on medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. §§ 404.1512(e), 416.912(e). In assembling a complete record, the SSA must "make every reasonable effort" to "get medical reports from [plaintiff's] medical sources." 20 C.F.R. §§ 404.1512(d), 416.912(d). "Every reasonable effort" means making "an initial request for evidence from [plaintiff's] medical source[s]," and, if no response has

been received, "one follow-up request."  20 C.F.R. §§
404.1512(d)(1), 416.912(d)(1).

### b. Analysis

In this case, contrary to plaintiff's arguments, the
ALJ adequately developed the record in making his findings.
Plaintiff contends that remand is necessary because the ALJ
erred in overlooking the gap in plaintiff's medical records with
respect to Dr. Kassapidis between 2004[1] and 2007.  (Pl. Mem. at
16.)  According to plaintiff, the ALJ "did not attempt to
rectify [the] noticeable gap in Plaintiff's record, either by
attempting to seek out additional medical information during
this period, or by contacting Dr. Kassapidis directly."  (*Id.*)

Here, the ALJ made reasonable efforts to get
information from plaintiff's treating physician.  The ALJ
adjourned plaintiff's first hearing date because there "[were]
no treating source records" and the record contained only
"consultative examinations."  (Tr. at 32.)  As a result,
plaintiff's medical records from Dr. Kassapidis were obtained by
the November 2009 hearing and entered into evidence.  (*Id*. at
36.)  Those records indicated that plaintiff visited Dr.
Kassapidis eight times in the six-year period following the

---

[1] Plaintiff's memorandum in support of his motion contends that there are no
records from Dr. Kassapidis during the periods "between 2003 to 2007" (Pl.
Mem. at 16), but the administrative record contains treatment notes of Dr.
Kassapidis throughout 2003 and dated as late as March 2004.  (*See* Tr. at 196-
213.)

alleged onset date of July 31, 2003.  (*See id.* at 23, 189-221.)

The ALJ was not required to take any further steps.  *See* 20

C.F.R. §§ 404.1512(d)(1), 416.912(d)(1).  Moreover, plaintiff's

argument that the record before the ALJ was insufficient to

determine the appropriate weight to afford Dr. Kassapidis's

opinion is belied by the fact that, when plaintiff's hearing

resumed in November 2009, plaintiff's counsel was aware of the

state of the record and never requested that anyone contact Dr.

Kassapidis again, either before or after the hearing, and even

stated during the hearing that "[plaintiff has] submitted

extensive records from [Dr. Kassapidis]."  (*Id.* at 36-38; *see

also* 6-7.)  Plaintiff's motion for judgment on the pleadings on

this point is therefore denied.

### 2.   The ALJ's Evaluation of Plaintiff's Treating Physician's Opinion

#### a. Legal Standard

"Regardless of its source," the regulations require

that "every medical opinion in the administrative record be

evaluated when determining whether a claimant is disabled under

the Act."  20 C.F.R. §§ 404.1527(d), 416.927(d).  Under the

Commissioner's regulations, the medical opinion of a treating

source "on the issue(s) of the nature and severity of [the]

impairment" will be given controlling weight if such opinion "is

well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other
substantial evidence in [the] record." 20 C.F.R.
§§ 404.1527(d)(2), 416.927(d)(2); *see also Burgess*, 537 F.3d at
128.  Medically acceptable clinical and laboratory diagnostic
techniques include consideration of a "patient's report of
complaints, or history, [a]s an essential diagnostic tool."
*Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003)
(internal quotation marks omitted).

 According to the Commissioner's regulations, the
opinions of treating physicians deserve controlling weight
because "'these sources are likely to be the medical
professionals most able to provide a detailed, longitudinal
picture of [the] medical impairment(s) and may bring a unique
perspective to the medical evidence that cannot be obtained from
the objective medical findings alone or from reports of
individual examinations.'" *Balodis v. Leavitt*, 704 F. Supp. 2d
255, 264 (E.D.N.Y. 2010) (quoting 20 C.F.R. §§ 404.1527(d)(2),
416.927(d)(2)).  "Although the treating physician rule generally
requires deference to the medical opinion of a claimant's
treating physician," courts have declined to give controlling
weight to those opinions where they are "not consistent with
other substantial evidence in the record." *Halloran*, 362 F.3d
at 32.  As a result, the less consistent a treating doctor's
opinion is with the record as a whole, the less weight it will

be given. *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (citing 20 C.F.R. § 404.1527(d)(4)). Moreover, under the regulations, the opinion of non-treating and non-examining doctors can override those of treating doctors so long as they are supported by evidence in the record. *Halloran,* 362 F.3d at 31-32; *accord Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983) ("It is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence . . . and the report of a consultative physician may constitute such evidence.") (citations omitted).

Where a treating physician's opinion on the nature and severity of a claimant's disability is not afforded "controlling" weight, the ALJ must give "good reasons" for the weight assigned to a treating physician's opinion. *Id*. at 32. Although the regulations do not exhaustively define what constitutes "good reason[]" for the weight given to a treating physician's opinion, the regulations provide the following enumerated factors that guide an ALJ's determination when declining to afford controlling weight to a treating physician on the issue of the nature and severity of a disability: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treating relationship; (3) the supportability of the treating source opinion; (4) the consistency of the opinion with the rest of the

record; (5) the specialization of the treating physician, and
(6) any other relevant factors.  20 C.F.R. §§ 404.1527(d)(2)-
(6), 416.927(d)(2)-(6); *see also Halloran,* 362 F.3d at 32.

Although the SSA also considers any opinion from
treating physicians regarding the RFC and disability of a
claimant, the final responsibility for determining these matters
is reserved to the Commissioner, not to physicians; therefore,
the source of an opinion on those matters is not given "special
significance" under the regulations.  *Francois v. Astrue,* No.
09-CV-6625, 2010 WL 2506720, at *6 (S.D.N.Y. June 21, 2010)
(citing 20 C.F.R. § 404.1527(e)(3)); *see also* 20 C.F.R.
§ 416.927(e)(1) ("A statement by a medical source that you are
'disabled' or 'unable to work' does not mean that we will
determine that you are disabled.").  In fact, "[t]he
Commissioner is not required, nor even necessarily permitted, to
accept any single opinion, even that of a treating physician, as
dispositive on the determination of disability." *Francois,* 2010
WL 2506720, at *5 (citing *Green-Younger,* 335 F.3d at 106).  The
ALJ may not, however, "arbitrarily substitute his own judgment
for competent medical opinion." *Balasmo v. Chater,* 142 F.3d 75,
81 (2d Cir. 1998) (internal quotation marks omitted).

Even though the disability determination is reserved
for the Commissioner, the Second Circuit has held that ALJs are
not exempt "from their obligation, under *Schaal* and [20 C.F.R.]

§ 404.1527(d)(2), to explain why a treating physician's opinions are not being credited." *Snell*, 177 F.3d at 134; *see also* 20 C.F.R. § 404.1527(d)(2) (the SSA "will always give good reasons in [its] notice of determination or decision for the weight [given to the claimant's] treating source's opinion"); *Martinez v. Astrue*, No. 06-CV-6219, 2010 WL 331694, at *9 (S.D.N.Y. Jan. 28, 2010) ("'If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.'") (quoting Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7 (July 2, 1996)).

An ALJ's failure to explicitly state "good reasons" for declining to adopt a treating source's opinion, even on issues that are determined by the Commissioner, is a ground for remand. *See, e.g.*, *Snell*, 177 F.3d at 133-34. An ALJ's failure to reconcile materially divergent RFC opinions of medical sources is also a ground for remand. *Caserto v. Barnhart*, 309 F. Supp. 2d 435, 445 (E.D.N.Y. 2004). Nevertheless, when substantial evidence supports the ALJ's decision, his lack of clarity in explaining the reasons why he afforded a treating physician's opinion with less-than-controlling weight does not mandate remand. *Halloran*, 362 F.3d at 32 (noting that it was "unclear on the face of the ALJ's opinion whether the ALJ considered (or even was aware of) the applicability of the treating physician rule," but refusing to remand on this basis

because substantial evidence supported ALJ's decision not to afford treating physician's opinion controlling weight).

### b. Analysis

For the reasons set forth below, remand is not warranted on the basis of the weight the ALJ assigned to Dr. Kassapidis's opinion. Although the ALJ is not required to accept any single opinion as dispositive of a claimant's disability determination, the ALJ is required to explain why he chose not to credit plaintiff's treating physician, and to reconcile any conflicting RFC opinions of other physicians on the record. *See Halloran*, 362 F.3d at 32. Here, the ALJ provided adequate reasons for assigning the weight he did to Dr. Kassapidis's opinion.

Most importantly, Dr. Kassapidis offered no findings suggesting that plaintiff was incapable of performing sedentary work, let alone an opinion regarding plaintiff's RFC that contradicted any other physician's opinion in the record. (*See* Tr. at 189-221.) The ALJ correctly noted that plaintiff's progress notes from Dr. Kassapidis from 2001 through the alleged onset date of July 31, 2003 show "generally unremarkable examinations," with the exception of occasional findings of respiratory discomfort in October 2001, February 2003, and March 2004. (*Id.* at 22-23.) Since the alleged onset date of July 31, 2003, Dr. Kassapidis's progress notes show that plaintiff's

lungs have been relatively clear and his blood pressure has been stable. (*Id.*) The ALJ, therefore, correctly surmised that there were no significant changes in plaintiff's progress reports throughout the period after plaintiff stopped working in 2003, and Dr. Kassapidis's notes from 2007 and 2009 are consistent with his findings prior to 2004. (*Id.* at 25.)

Based on the medical record, the ALJ assigned Dr. Kassapidis's opinions "controlling weight insofar as they support a finding that the claimant's conditions do not meet or equal a listing," (*id.* at 26.), but this language should not be taken to mean that Dr. Kassapidis made any findings to the contrary — he did not (*see id.* at 189-221). In assigning Dr. Kassapidis's opinions "controlling weight insofar as they support a finding that the claimant's conditions do not meet or equal a listing," the ALJ adequately considered plaintiff's longitudinal medical history, as reflected in plaintiff's progress reports from Dr. Kassapidis that spanned eight years. (*Id.* at 25-26.) This medical history, however, simply "[was] not consistent with [plaintiff's] allegation of disability." (*Id.* at 25.)

The ALJ also accorded "great weight" to the medical expert, Dr. Bernard Gussoff. (*Id.*) The ALJ found that the Dr. Gussoff's testimony was consistent with the rest of the medical evidence in the record, and review of the record demonstrates

that his conclusions were in fact based on the evidence presented therein. (*Id.* at 24.) Dr. Gussoff based his opinions on the results of plaintiff's August 2009 pulmonary function tests, concluding that these results were "close to normal" and produced no "sufficient symptom" that met the listing in section 3.02. (*Id.* at 53.) Dr. Gussoff also concluded — based on the absence of any episodes of retinitis or acidosis in the progress reports on record — that plaintiff's pain in his extremities did not meet the listing in section 9.09. (*Id.* at 24, 56.) The ALJ thus correctly found that there were no materially divergent findings between Dr. Gussoff and plaintiff's treating physician, and that Dr. Gussoff's findings were adequately supported by the evidence in the record. Accordingly, to the extent there is even a difference between the two opinions, the ALJ did not err in ascribing greater weight to the medical expert than to plaintiff's treating physician. *See Mongeur*, 722 F.2d at 1039.

The ALJ determined that the opinion of Dr. Han, the SSA's examining consultative physician, was entitled to "significant weight" because it was consistent with the medical expert's testimony and "supported by the balance of the evidence." (Tr. at 25.) The ALJ also concluded that Dr. Han's examination was consistent with plaintiff's previous progress reports from Dr. Kassapidis. (*See id.* at 23.) Dr. Han reported that plaintiff was able to complete basic household errands and

move without severe pain or discomfort. (*Id.*)  Dr. Han noted

plaintiff's diabetes, but recorded that plaintiff's weight had

dropped since a 2007 examination, and noted that plaintiff had

no pain in his extremities. (*Id.*)  The pulmonary function tests

performed at Dr. Han's request showed mild obstruction, but did

not indicate any severe or debilitating discomfort. (*Id.*)

Therefore, Dr. Han's examination yielded findings consistent

with the balance of the record even though it was performed

without the benefit of plaintiff's full medical history.  The

ALJ correctly found that there were no materially divergent

findings between Dr. Han and plaintiff's treating physician,

that Dr. Han's findings were adequately supported by the

evidence in the record.  The ALJ thus committed no error in

ascribing "significant weight" to Dr. Han's opinion.  *See*

*Mongeur*, 722 F.3d at 1039.

### 3. The ALJ's Evaluation of Plaintiff's Credibility and Subjective Complaints of Pain

#### a. Legal Standard

Plaintiff's statements of pain or other symptoms,

without more, cannot serve as conclusive evidence of disability.

*See Francois*, 2010 WL 2506720, at *7 (citing 42 U.S.C.

§ 423(d)(5)(A)).  The regulations therefore create a two-step

process to evaluate a claimant's assertions regarding symptoms

such as pain.  *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir.

2010).  First, the ALJ must determine if a claimant has a

"medically determinable impairment that could reasonably be

expected to produce the symptoms alleged."  *Id.* (citing 20

C.F.R. § 404.1529(b)).  If an impairment of that nature is

present, the ALJ must then determine "'the extent to which [the

claimant's] symptoms can reasonably be accepted as consistent

with the objective medical evidence and other evidence'" in the

administrative record.  *Id.* (quoting 20 C.F.R. § 404.129(a)).

If a plaintiff offers statements about symptoms that are not

substantiated by objective medical evidence, the ALJ must make a

finding as to the plaintiff's credibility.  *See Cook v. Astrue,*

No. 11-cv-479, 2012 WL 715966, at *7 (E.D.N.Y. Mar. 2, 2012)

(citing SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996)).

Because an ALJ has "the benefit of directly observing a

claimant's demeanor and other indicia of credibility," his

decision to discredit subjective testimony may not be disturbed

on review if his disability determination is supported by

substantial evidence.  *Brown v. Astrue*, No. 08-CV-3653, 2010 WL

2606477, at *6 (E.D.N.Y. June 22, 2010).

When a claimant's symptoms indicate "a greater

severity of impairment than can be shown by the objective

medical evidence alone," the ALJ must consider these factors in

making a credibility determination: (1) the claimant's daily

activities; (2) the location, duration, frequency, and intensity

of pain and other symptoms; (3) any precipitating and
aggravating factors; (4) the type, dosage, effectiveness, and
side effects of any medications taken; (5) other treatment
received; (6) other measures taken to relieve symptoms; and (7)
any other factors concerning the individual's functional
limitations and restrictions due to pain or other symptoms.  20
C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416929(c)(3)(i)-(vii); *see*
*also Cook*, 2012 WL 715966, at *7.  The ALJ is required to
consider all of the evidence in the record and give specific
reasons for the weight accorded to the claimant's testimony,
taking into account the factors enumerated in 20 C.F.R.
§ 404.1529(c)(3).  *See Cook*, 2012 WL 715966, at *7.

> **b. Analysis**

In this case, the ALJ correctly concluded that
plaintiff's testimony regarding the extent of his symptoms was
inconsistent with the medical record.  Consequently, the ALJ
appropriately discounted plaintiff's subjective statements of
pain and limitations and remand is not appropriate on this
basis.

The ALJ must consider "the extent to which
[plaintiff's] symptoms can reasonably be accepted as consistent
with the objective medical evidence and other evidence of
record." *Genier*, 606 F.3d at 49.  Here, plaintiff testified
that he stopped working because of complications following his

lung surgery and because of uncontrolled diabetes.  (Tr. at 4.)
Plaintiff stated that he experienced foot pain so severe that he
was unable to stand, dizziness, and extreme discomfort
breathing, all of which increased after the alleged onset date
of July 31, 2003.  (*Id.* at 37, 49.)  These subjective
statements, however, are not supported by the objective evidence
in the record.

Although plaintiff's lung surgery occurred in 1998,
followed by the alleged onset of his coughing (*see id.* at 43),
plaintiff worked thereafter for five years before leaving his
job (*see id.* at 12).  Plaintiff's treating physician did not
note any significant change in plaintiff's medical condition in
the intervening time between the surgery and plaintiff's
retirement.  (*See id.* at 206-221.)  There are no references to
plaintiff's complaints of dizziness or fatigue until after 2003,
and the only references in the record to plaintiff's cough
appear after October 2003, after plaintiff retired.  (*See id.* at
202, 195, 198, 222.)  There is also scant objective evidence to
support plaintiff's complaints about difficulty standing and
walking.  Plaintiff never complained to Dr. Kassapidis of such
pain, and Dr. Kassapidis's own findings show normal results.
(*See id.* at 192, 196, 198, 200, 202, 204.)  The ALJ correctly
pointed out that Dr. Kassapidis's progress notes "simply fail to
confirm the accuracy of the claimant's assertions and hearing

testimony." (*Id.* at 25.)  Further, the medical expert testified that many of plaintiff's symptoms could have been controlled with medication and monitoring.  (*See id.* at 53, 54-55.)  The medical expert testified that coughing like the kind that plaintiff experienced would have been a nuisance, but would not have been an actual impediment to sedentary work.  (*Id.*)

Finally, the ALJ was correct in noting that plaintiff's statements concerning his pain were inconsistent with his own description of his daily activities.  (*See id.* at 25.)  For example, plaintiff lives alone, cooks, cleans, shops, and does his own laundry without assistance.  (*Id.* at 46, 171.)  He is able to push and pull grocery carts and uses public transportation and travel independently, although he takes elevators whenever possible and avoids stairs.  (*Id.* at 42-43, 46.)  Plaintiff also regularly walks four blocks to and from his church (albeit slowly), without assistance from a cane or other person.  (*Id.* at 22.)  This suggests that plaintiff is able to sit without restriction, stand comfortably, and walk intermittently over the course of an eight-hour work day.  Consequently, the ALJ did not err in discounting plaintiff's subjective statements of his symptoms in concluding that plaintiff was capable of performing sedentary activity, because the ALJ's decision to do so was supported by substantial objective evidence in the record.

**4. The Absence of a Vocational Expert's Testimony at the Hearing**

**a. Legal Standard**

Under the fourth step of the five-step analysis, "the claimant has the burden to demonstrate an inability to return to h[is] previous specific job and an inability to perform h[is] past relevant work generally." *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003) (emphasis omitted). While an expert "is often called upon to explain the requirements of particular jobs, step four of the analysis does not actually require that an ALJ consult an expert." *Petrie v. Astrue*, 412 F. App'x 401, 409 (2d Cir. 2011) (citation omitted) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2) ("A vocational expert or specialist *may* offer expert opinion testimony . . . about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy.") (emphasis added).

"Generally speaking, if a claimant suffers only from exertional impairments, *e.g.*, strength limitations, then the Commissioner may satisfy her burden" without hearing the testimony of a vocational expert. *Rosa v. Callahan*, 168 F.3d 72, 82 (2d Cir. 1999) (internal quotation marks omitted).

Nevertheless, "the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert." *Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986). Instead, "[a] more appropriate approach is that when a claimant's nonexertional impairments significantly diminish his [or her] ability to work . . . then the Secretary must introduce the testimony of a vocational expert." *Id.* A vocational expert is necessary only if a claimant's nonexertional impairments "significantly limit[] the range of work permitted by [the claimant's] exertional limitations to the point that the medical-vocational guidelines did not adequately reflect [the claimant's] condition." *Whipple v. Astrue*, 479 Fed. App'x 367, 371 (2d Cir. 2012).

### b. Analysis

As an initial matter, the court has already held that the ALJ did not err in this case by failing to recontact Dr. Kassapidis because the ALJ made adequate efforts to obtain records from the plaintiff's treating sources. Likewise, the ALJ also did not err in this case by declining to consult a vocational expert on step four of the analysis because plaintiff did not carry his burden to show that he suffers from any identifiable nonexertional impairments that would necessitate the input of a vocational expert.

Plaintiff contends that the ALJ erred in finding plaintiff capable of performing his past relevant work and sedentary work in general because the ALJ did not adequately develop the record of plaintiff's treating physician, Dr. Kassapidis. (Pl. Mem. at 23.) Plaintiff asserts that the ALJ should have questioned plaintiff "thoroughly" regarding plaintiff's coughing symptoms, and did not elicit any "precipitating factors" to his coughing fits, such as "the possibility of being exposed to irritants such as dusts or fumes." (*Id.* at 24.) According to plaintiff, such additional records and questioning "perhaps" would have revealed if plaintiff suffered from "environmental restrictions, and, thus nonexertional impairments," which would have "perhaps" necessitated the testimony of a vocational expert regarding plaintiff's ability to perform either his past work or work existing in the national economy. (*Id.*)

As outlined above, plaintiff bears the burden of on step four of the ALJ's analysis. *See, e.g., Jasinski*, 341 F.3d at 185. Here, however, plaintiff has produced no evidence suggesting that fumes or irritants might exacerbate his COPD (*see id.* at 44-45, 49, 141-43), and his counsel's speculation as to whether any evidence to that effect even exists does not suffice. Where, as here, a claimant has not presented any evidence that he suffers from a nonexertional impairment, an ALJ

is not required to contact a vocational expert. *See* C.F.R.

§§ 404.1560(b)(2). Moreover, there is nothing about plaintiff's

past job,[2] or sedentary jobs in general, that would require

plaintiff to come into contact with fumes, dust, or irritants

while performing a sedentary form of work. *See* SSR 96-9p; SSR

85-15 (listing precipitating environments for nonexertional

impairments as "those involving . . . recognized

hazards . . . [such as] fumes, dust, and poor ventilation" and

stating that "most job environments do not involve

great . . . amounts of dust [and irritants]"). Similarly,

plaintiff's description of his cough as a constant, daily

phenomenon suggests it is not "precipitated" by any particular

factors or triggers.

Further, even if plaintiff had carried his burden to

demonstrate that he did suffer from a nonexertional impairment,

the ALJ was not required to call a vocational expert unless the

impairment "significantly diminish[ed] his ability to do

work . . . so that [plaintiff] is unable to perform the full

range of employment indicated by the medical-vocational

guidelines." *Bapp*, 802 F.2d at 603 (noting that "the mere

existence of a nonexertional impairment does not automatically

---

[2] Although at one point plaintiff alleged that his 1998 lung surgery was
performed in response to complications caused by a damaged air filter at his
place of employment, this allegation is uncorroborated and the overall
evidence suggests that this was an unusual and temporary episode not
reflective of plaintiff's normal working conditions. (*See* Tr. at 170.)

require the production of a vocational expert"). Therefore, in this case, without evidence that plaintiff suffered from any kind of nonexertional impairment, the ALJ did not err in finding plaintiff capable of performing his past relevant work in the absence of vocational expert's opinion. Remand is therefore not warranted on this ground.

## Conclusion

For the foregoing reasons, the court grants defendant's motion for judgment on the pleadings and denies plaintiff's cross-motion for judgment on the pleadings. The Clerk of the Court is respectfully requested to enter judgment in favor of defendant and to close this case.


**SO ORDERED.**

Dated:     Brooklyn, New York
           March 5, 2013

                         _____/s/_____
                         **KIYO A. MATSUMOTO**
                         United States District Judge
                         Eastern District of New York